MATTIE A. ELLIOTT, APPELLEE, v. GENERAL CONSTRUCTION COMPANY, APPELLANT.

FILED MARCH 28, 1913.    No. 17,112.

1. **Appeal:** PARTIES: REVIEW. In the title of a petition, the naming of "Mattie A. Elliott" as plaintiff, instead of "Mattie A. Elliott, administratrix of the estate of Howard Elliott, deceased," is not a ground of reversal in a record showing that defendant answered to the merits of an amended petition containing the correct title, and that, without prejudice to defendant, the case was tried as if there had been no such defect.

2. **Master and Servant:** INJURY TO SERVANT: ASSUMPTION OF RISKS. An employee does not ordinarily assume risks arising from conditions beyond his knowledge and not obvious to a person of his experience and understanding.

3. ———: ———: NEGLIGENCE OF MASTER. A master who puts an inexperienced servant to work in a hazardous position among

electric power wires carrying dangerous currents of electricity, without properly instructing him in regard to his duties and without giving him specific warning of incident dangers not obvious to a person of his experience and understanding, cannot justify such conduct by showing that the servant had represented himself to be an experienced lineman in telephone work involving no danger from electricity, where the master knew in advance that the servant had never had any experience in working among dangerous wires.

4. Negligence: QUESTION FOR JURY. Negligence in constructing and in using electric wires carrying dangerous currents of electricity is a question for the jury, where the evidence on that issue is conflicting.

APPEAL from the district court for Douglas county: WILLIAM A. REDICK, JUDGE. *Affirmed.*

*Greene, Breckenridge, Gurley & Woodrough,* for appellant.

*W. C. Lambert* and *S. L. Winters, contra.*

ROSE, J.

While Howard Elliott was in the employ of defendant, he came in contact with electric wires among which he was working at the top of a pole and was instantly killed. This is an action by his mother as administratrix of his estate to recover resulting damages in the sum of $25,000. Upon a verdict of a jury, judgment was rendered in favor of plaintiff for $7,500. Defendant has appealed.

A reversal is demanded because the mother of decedent brought the suit in her own name instead of suing for damages as administratrix. It is true that the title of the petition is defective in naming "Mattie A. Elliott" as plaintiff, instead of "Mattie A. Elliott, administratrix of the estate of Howard Elliott, deceased." The ruling on this point, however, is adverse to defendant for the following reasons: In the body of the petition there is a proper plea that plaintiff is the duly appointed and qualified administratrix of her son's estate. An amended petition

with a correct title was filed. Before trial the defect was not specifically called to the attention of the court by motion or demurrer. Defendant pleaded to the merits of the amended petition. The trial would not have proceeded differently had the action been brought in the name of the administratrix. It was shown by the evidence that she was a widow, with a number of children, and that her deceased son had contributed regularly to her support. In the instructions the administratrix was treated as plaintiff, and in her representative capacity the jury found in her favor. In this respect the judgment is the same. Defendant was not prejudiced by the irregularity challenged, and it would be carrying a technical objection too far to reverse the judgment on this ground.

One of the assignments of error presents this question: Was there an erroneous refusal to direct a verdict in favor of defendant on the grounds that Elliott accepted employment with full knowledge of its hazards; that his death resulted from assumed risks; that negligence on the part of defendant was not the proximate cause of his death; that defendant was not negligent in locating or constructing any wire at the place of the accident, or in failing to warn him of danger? Attention is thus directed to the evidence submitted to the jury. By means of extension-arms bolted to the top of a 30-foot pole 25 feet above the ground, Elliott was engaged with other employees in elevating electric power wires running along the north side of an electric street railway track between South Omaha and Ralston. Three wires, each carrying 5,300 volts of electricity, were attached to insulated pins on a cross-arm bolted in the center to the top of the pole. There was a wire at each end of the cross-arm. The other power wire was $17\frac{1}{2}$ inches from the south wire and 35 inches from the north one. A metal trolley bracket, hanging over the street railway track, swung from the pole $31\frac{1}{2}$ inches below the cross-arm. Two concatenated wires, one above the other, hung over the street car track, the upper wire being attached to an insulated pin on the south end

of the bracket. The bracket itself was supported by an iron rod running from the outer end to the top of the pole. The upper wire is the messenger and bears the weight of both, while the lower one is the trolley wire which carries electric currents and applies them to the trolley on the street cars. The trolley wire carried 500 volts of electricity and the messenger wire carried practically the same voltage. In addition to the wires described, a small, uninsulated copper wire was attached at one end to the messenger wire. It wound around the metal trolley bracket, followed it nearly to the pole, ran down the pole to a cluster of incandescent lamps, and from there, through a switch, to the ground. One of the obvious effects of this copper wire was to undo the insulation protecting the trolley bracket and the iron rod from the electric currents carried by the messenger wire.

It will thus be seen that within three feet of the top of the pole there were four wires, one metal trolley bracket, and an iron rod, all carrying electricity. Elliott ascended the pole by means of spur climbers, and, to prevent falling, fastened himself to the top with a belt. With the upper part of his body between the north power wire and the one next to it, and his left foot near the trolley bracket and the copper wire, he had taken a postion on the east side of the pole, intending to unscrew the nut from the bolt which held the cross-arm in place, and to assist in raising the cross-arm on extension-arms already bolted to the pole. He carried a metallic brace and bit, either attached to his belt or in one hand. A fellow servant on the west side of the pole a little lower down handed him a 12-inch iron monkey-wrench. He took it for the purpose of unscrewing the nut at the top of the pole. There were sputtering sounds. The brace and bit fell to the ground. His body swung from his belt.

The pleadings raised these issues: Did Elliott assume the risks of his employment knowing the conditions and danger? Was defendant guilty of negligence in failing to properly instruct Elliott of his danger or in using the un-

insulated copper wire connecting the messenger with the trolley bracket and the ground? Was such negligence the proximate cause of Elliott's death? He began work Monday, July 12, 1909, and was killed the next day. He had never before worked on lines carrying dangerous currents. During the two days he had been in defendant's service, his experience with high voltage wires was limited to four or five poles. The danger incident to his work where he was killed existed only on one other pole, and it does not appear that he had unbolted the cross-arm thereon. Defendant relies on testimony of the manager who employed Elliott, of the foreman in charge of the work, and of other witnesses, to show that the employee had represented himself to be an experienced lineman; that he knew the dangers incident to such service; that he had been told of the dangers; that he promised to be careful; and that he had presented himself already equipped for a lineman's work. The court, however, was not bound to accept all the testimony of this nature as conclusive of the issue. The manager admitted that Elliott told him his work as a lineman had been confined to telephone lines carrying electricity in harmless quantities only. The manager's warnings of danger, as shown by his own testimony, were general in their nature. From them a court or jury might properly infer that they were not intended for a lineman who was experienced in working among wires carrying dangerous currents of electricity. The foreman in charge of the work in hand was on the pole or near it when the accident occurred. He admitted that Elliott had asked him about the danger, and had told him of having had no experience with "hot wires." Elliott was not specifically warned of the danger of the copper wire and the bracket, carrying, as they did, the voltage of the messenger wire, running beneath the high potential power wires, and communicating with the ground. Nor does the evidence conclusively show that Elliott knew, or should have known, of such danger. If, therefore, testimony that Elliott represented himself to

be an experienced lineman and appeared for work with a lineman's outfit is uncontradicted, both the manager and the foreman, when he was employed, knew he had no previous experience among dangerous wires like those on the pole where he was directed to work. Not having such knowledge, they could not send him into a place of danger without proper instructions, and justify their conduct by showing that he represented himself to be an experienced lineman in telephone work involving no danger from electricity. When all the circumstances are considered, the evidence is sufficient to sustain a finding that Elliott's knowledge, experience and representations did not, under well-settled rules of law, prevent a recovery on the ground that he assumed the risks to which he was exposed. The question was one for the jury.

Was there evidence tending to show negligence in the use of the uninsulated copper wire, which carried electricity along the trolley bracket to the ground, and in failing to specifically warn the inexperienced employee of the danger? There is some direct proof on the affirmative of this issue. Exhibits introduced by defendant, in connection with other evidence, indicate that, except for the copper wire, the trolley bracket would have been protected by an insulated pin from the voltage of the messenger wire. There was the same necessity for insulating the copper wire that there had been for protecting the bracket. The effect of using the copper wire in the manner described, without insulation, was to make three unprotected conductors to the pole and one to the ground, where, otherwise, there would have been none. The evidence of negligence in this respect is sufficient.

Was the negligence proved the proximate cause of Elliott's death? Mere contact with one of the three power wires among which Elliott was working did not cause the accident. This is shown by the evidence. When Elliott was at the top of the pole his fellow servant told him that his arm was against a wire. He replied: "I know it." An electrician to whom Elliott had first reported for work

testified: "I told him that he wanted to be very careful of those wires in handling them, if he had to touch them at all." Of the three power wires, the one by the pole on the south side was the nearest to Elliott's left side. His left foot was near the copper wire and the bracket. His death could have been caused by a short circuit resulting from simultaneous contacts with two power wires, or with one power wire and either the copper wire or the bracket. If death resulted from contacts with two power wires, the negligent use or construction of the copper wire was not a contributing cause. The other explanation, however, is more substantial. Simultaneous contact above and below, when the conditions are observed, could have resulted from resetting the spurs in the pole or from natural motions of the limbs or the body, either in adjusting or in using tools. That the fatality occurred in this way is supported by proof of burns on the left arm and on the left side, by an opening in the sole of the left foot, and by a hole in the left shoe. Defendant insists, however, that the latter theory cannot be 'accepted, because, if the currents had been short-circuited in that manner, the voltage from one of the power wires, it is asserted, would have melted the small copper wire, which was left in its former condition. On conflicting evidence, the jury found otherwise and settled that question adversely to defendant. In this view of all the evidence, the case was properly submitted to the jury without error in the instructions. The rulings on evidence are also approved.

It is further argued that the judgment is excessive. On this point Judge BARNES and the writer are of opinion that the recovery exceeds the damages proved by at least $2,500. On the contrary, it is held by the majority that the district court did not err in sustaining the verdict as rendered.

AFFIRMED.